Robert Tauler, Esq. (SBN 241964)
rtauler@taulersmith.com
Camrie Ventry, Esq. (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff*
*Danielle Lynne Garfinkel*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE LYNNE GARFINKEL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>REALCLEARHOLDINGS, LLC, an Illinois limited liability company; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51)** |

CLASS ACTION COMPLAINT

## INTRODUCTION

1. Defendant operates an online news site https://realclearmarkets.com/ (the "Website") which is riddled with data broker software intended to spy on all visitors and learn (1) who they are, (2) where they are (3) what they read, (4), and (3) how they read it. Defendant's business can be understood to be in service of a surveillance state, deploying the software of four registered data brokers to gather information about readers, starting with data about a Website visitor's computer, location, and browsing habits, then compiled and correlated with extensive external records maintained by the data brokers.

2. Needless to say, this is done without the consent of their readers, who, should they be informed of defendant's sale of personal information, would never agree to visit the Website.

3. Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

5. Defendant is an Illinois limited liability company that operates several news aggregation and analysis websites. Defendant actively markets its products to California businesses and proprietors. It maintains ongoing business relationships with such California customers. Defendant derives substantial revenue from California-based transactions through its operation of the Website. Defendant deliberately avails itself of California's commercial privileges by operating its interactive Website infrastructure, which Defendant specifically designed to engage

California customers. For example, Defendant specifically tags any article related to the State of California to allow readers to view a "California Story Stream." Similarly, Defendant also tags any article related to Los Angeles to allow readers to view a "Los Angeles Story Stream."

6. Further, Defendant specifically intended its surveillance operations to cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

7. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

## PARTIES

8. Plaintiff Danielle Lynne Garfinkel ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California. Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

9. Defendant RealClearHoldings is an Illinois limited liability company that owns, operates, and/or controls https://realclearmarkets.com/ (the "Website"). Through the Website, RealClearHoldings aggregates news articles from across the internet, including articles from numerous California publications such as the Los Angeles Times and the California Post.

10. Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify

these entities when Defendant's discovery responses reveal their true names and roles.

11. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

12. Defendant is the proprietor of the Website.

13. The Website, like most other websites, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices. On information and belief, Defendant and the Website can determine the geolocation from, for example, a visitor's IP address. The unlawful surveillance alleged herein collects information that can identify a Website visitor well beyond his or her IP address.

14. Defendant has partnered with California-registered and unregistered Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors ("Data Brokers," and each a "Data Broker"). Defendant has done this by installing code developed by Data Brokers ("Data Broker Software") on the Website.

15. Data Broker Software designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

### Registered California Data Brokers

16. Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

17. Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

18. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

19. Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

20. Defendant has in fact partnered with the Data Brokers mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing Data Brokers to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organization who does not purchase it.

**Defendant and the California Data Brokers**

21. Defendant's installation and use of Data Broker Software violates the California Trap and Trace law.

22. Specifically, Defendant has installed the Data Broker Software of Comscore; LiveRamp; MediaMath; and Outbrain (the "Data Broker Software") on its Website.

23. Comscore; LiveRamp; MediaMath; and Outbrain function as follows:

### Comscore

24. As a registered data broker in California, Comscore monitors individual users across sites via unique IDs and captures their real-time browsing metadata (IP, pages, timestamps) for analysis.

25. The Comscore Software functions as follows:

26. First, when a user visits a tagged site, the Comscore Software triggers an HTTP request to Comscore's servers. This request transmits identifying signals in real time – including the user's IP address, a timestamp, and browser type.

27. Second, the Comscore Software sets a unique cookie in the user's browser upon first contact, which enables recognizing that browser on subsequent sites. This allows Comscore to "observe 'browser-level' behavior, i.e. how often you return to a website or if, having visited one website, you go to another related one."

28. Third, the Comscore Software intercepts the user's web request and logs it to a third-party server along with persistent identifiers. The data collected (page URLs, titles, visit times, IP, etc.) is used to build user profiles and deduplicate audiences across different websites. In other words, gathered data is correlated with demographic or personal information in Comscore's panel, which Comscore can then sell.

29. The Comscore Software thus facilitates continuous, cross-site tracking of users via a unique ID tied to their device.

### LiveRamp

30. LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LiveRamp Software tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID." The LiveRamp Software functions as follows:

31. First, when the LiveRamp Software loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party

CLASS ACTION COMPLAINT
6

cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

32. Second, the data obtained by the LiveRamp Software is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

33. Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number). LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

## MediaMath

34. MediaMath's business revolves around collecting and leveraging user data for targeted marketing. It partners with numerous advertisers and publishers, embedding its tracking code (the "MediaMath Software") on websites to gather information about visitors.

35. The MediaMath Software ""identifies you by means of personal data related to your computer or device using cookies and other similar technologies." Specifically, the MediaMath Software collects "the time you visited the site, the page URL, your IP address, your browser type, the operating system, the type of device… and data regarding your activities on the site. MediaMath then assigns your browsers and devices a "unique identifier called a 'MediaMath ID'" to help track you in the future.

36. This in turn allows MediaMath to build a profile about you. The purpose of this is to create a profile so that MediaMath, its partners, and

its customers, can ingest external data about a user and match it to that user's profile via the MediaMath ID.

37. In this regard, MediaMath confirms it engages in "Cookie Syncing" with third-party partners, where it matches a user's MediaMath ID with identifiers used by other companies. In other words, MediaMath shares and receives unique identifiers to expand the tracking net, connecting what it captures through its own pixels with data from across the ad tech industry.

### Outbrain

38. Outbrain is a content recommendation platform, advertising network and personalization engine for content. Outbrain is registered as a data broker in California.

39. The Outbrain Software functions as follows:

40. First, when a page loads, the Outbrain Software captures the user's IP address and translates that IP into a general geolocation (city/region). It also notes the device type, browser type, operating system, and referring URLs. All of this happens via the web requests the browser makes to Outbrain's domain to fetch content or ping for tracking.

41. Second, the Outbrain Software will drop a cookie on the user's browser (if not already present) to assign a Unique User ID (UUID). This UUID is an identifier that Outbrain uses to keep track of that user on any Outbrain-enabled site. Outbrain's systems catalogue and analyze the content you consume across partner sites associated with that UUID.

42. Third, the Outbrain Software logs information about the user's interaction with the page and stores it in order to accumulate a browsing profile about a user without their consent.

**Plaintiff Was Subjected to Trap and Trace Devices on the Website**

43. Plaintiff visited the Website on September 24, 2025. When Plaintiff did so, their identifying information was sent to all of the Data Brokers, by way of electronic impulses.

44. The purpose of this transfer of data from Defendant to the Data Brokers was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described *supra*). The transfer benefitted Defendant and the Data Brokers financially and took away the ability of Plaintiff to control her data.

45. On information and belief, the Data Brokers took Plaintiff's information and added the information to its profiles of Plaintiff. In turn, Defendant received other relevant data obtained by the Data Brokers regarding Plaintiff. Further, the Data Brokers can use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

46. In this regard, a recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[1] There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected

---

[1] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

noncitizens.[2] Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[3]

47. The prospect of private entities such the Data Brokers sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025. Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[4] During this year, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[5] Further, the current federal administration has threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[6] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

48. The *only purpose* of the Data Broker Software is to identify users and then track them on the internet.

49. The Data Broker Software meet the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because they process capture signaling information (who the visitor is, and what they are doing) in order to identify the

---

[2] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/.
[3] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185.
[4] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html.
[5] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630.
[6] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417.

source of an otherwise anonymous website visit – which such visit constitutes an electronic communication.

50. There is no way for Plaintiff to learn what the Data Broker Software did with Plaintiff's data, including what inferences the Data Brokers have gleaned from it, or when, why and to whom the Date Brokers have sold or licensed Plaintiff's data without discovery. As such, Plaintiff has been injured by Defendant's surveillance practices.

51. Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Broker for mercantile purposes. Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret, with only superficial government oversight, and without public disclosure of their operations.

### The Data Broker Software Are Trap and Trace Devices.

52. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

53. For all of the Data Brokers, their Data Broker Software operates as a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with the Data Brokers to obtain the users' identifying information including telephone numbers.

54. The Data Broker Software is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, the Data Broker Software are designed solely to meet this objective.

55. Defendant did not obtain a court order before installing or using Data Broker Software on its Website.

56. Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with the Data Brokers for the purposes of de-anonymization, profiling, and targeting. In fact, much of Defendant's data sharing with the Data Brokers occurred within milliseconds of Plaintiff's landing upon the Website, further confirming that Plaintiff was not even given an opportunity to consent.

57. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

58. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

## CLASS ALLEGATIONS

59. Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent to Comscore; LiveRamp; MediaMath; and Outbrain as a result of visiting the Website within the limitations period.**

60. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

61. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a. Whether the Data Broker Software are trap and trace processes as defined by California law;

    b. Whether Plaintiff and Class Members are entitled to statutory damages;

    c. Whether Class Members are entitled to injunctive relief; and

    d. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

62. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by the Data Broker Software, Plaintiff is asserting claims that are typical of the Class.

63. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

64. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts

in which individual litigation of numerous cases would proceed and address identical issues.

# FIRST CAUSE OF ACTION

## Violations of California Trap and Trace Law

## Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

65. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

66. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

67. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

68. The Data Broker Software, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c). The Data Broker Software is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website in violation of the California Trap and Trace Law.

69. Defendant did not obtain a court order before using or installing the Data Broker Software on the Website. Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the Data Broker Software, to identify visitors to its Website.

70. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

# **PRAYER**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2. An order that data unlawfully obtained by Defendant's deployment of a trap and trace device be disgorged;

3. An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4. Statutory damages pursuant to CIPA;

5. Reasonable attorneys' fees and costs; and

6. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: January 27, 2026                                TAULER SMITH LLP


By:  */s/ Robert Tauler*
Robert Tauler, Esq.
*Attorneys for Plaintiff*
Danielle Lynne Garfinkel

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: January 27, 2026

TAULER SMITH LLP

By: */s/ Robert Tauler*
Robert Tauler, Esq.
*Attorneys for Plaintiff*
*Danielle Lynne Garfinkel*